No. 25-30408

# In the United States Court of Appeals for the Fifth Circuit

LOUISIANA SHRIMP ASSOCIATION; JOHN BROWN; LARRY HELMER, JR.; PENNY V. ZAR

*Plaintiffs-Appellants,*

v.

HOWARD LUTNICK, SECRETARY, U.S. DEPARTMENT OF COMMERCE, IN HIS OFFICIAL CAPACITY; NATIONAL MARINE FISHERIES SERVICE; DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY,

*Defendants-Appellees.*

Appeal from the United States District Court for the Eastern District of Louisiana, No. 24-156

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

SARAH HARBISON
PELICAN INSTITUTE FOR
   PUBLIC POLICY
400 Poydras Street, Suite 900
New Orleans, LA 70130
Tel. (504) 952-8016
sarah@pelicaninstitute.org

*Counsel for Appellants*

JOSEPH S. ST. JOHN
 *Counsel of Record*
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
Tel. (410) 212-3475
scott@stjohnlaw.com

*Counsel for Appellant*
*Louisiana Shrimp Association*

i

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants**: Louisiana Shrimp Association, John Brown, Larry L. Helmer, Jr., and Penny V. Zar.

**Defendants-Appellees:** Howard Lutnick, Secretary, U.S. Department of Commerce, in his official capacity; National Marine Fisheries Service; and Donald J. Trump, President of the United States, in his official capacity.

**Counsel for Plaintiffs-Appellants:** James Baehr formerly represented Plaintiffs-Appellants. Sarah Harbison from the Pelican Institute for Public Policy represents Plaintiffs–Appellants. Joseph Scott St. John from St. John LLC represents Plaintiff-Appellant Louisiana Shrimp Association.

**Counsel for Defendants-Appellees:** Frederick Harter Turner, Mark A. Brown, and Thekla Hansen-Young from the U.S. Department of Justice represent the Defendants–Appellees.

/s/ Joseph S. St. John
Joseph S. St. John
*Counsel for Plaintiff-Appellant*
*Louisiana Shrimp Association*

Dated: November 21, 2025

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs–Appellants respectfully request oral argument. This appeal presents significant questions of administrative law concerning the National Marine Fisheries Service's reversal of longstanding regulatory policy and its imposition of economically devastating requirements on Louisiana shrimpers.

Given the substantial economic consequences for a vital regional industry, the important principles of administrative law implicated by the agency's change in position, and the broader precedential effect this decision will have on the scope of agency procedure within this Circuit, oral argument would materially assist the Court in resolving these questions of law.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................... iv

TABLE OF CONTENTS ........................................................................ v

TABLE OF AUTHORITIES ................................................................ vii

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ............................................................... 3

REGULATORY HISTORY AND THE 2019 FINAL RULE ..................... 4

THE LOUISIANA AND CENTER FOR BIOLOGICAL DIVERSITY LITIGATIONS . 11

PROCEEDINGS BELOW ................................................................ 12

STANDARD OF REVIEW ................................................................... 13

SUMMARY OF THE ARGUMENT ..................................................... 14

ARGUMENT ....................................................................................... 16

I.   NMFS's Reversal of Its Longstanding Tow-Time Policy Was Arbitrary and Capricious. .................................................................. 16

   A.   The basic facts of turtle interactions have not changed. ............ 17

   B.   The agency failed to identify any data — and certainly no *new* data —that justifies its change in position. ..................................... 18

   C.   NMFS elided or failed to consider facts that undermined the need for the 2019 Final Rule. ........................................................... 23

   D.   NMFS impermissibly changed its regulatory presumption sub silentio. .................................................................................................. 26

II.   NMFS failed to account for the shrimping industry's forty years of reliance interests. ................................................................................. 27

III.   NMFS's failed to seek and use Louisiana's scientific data before or after the 2019 Final Rule. ................................................................. 29

CONCLUSION .................................................................................... 31

CERTIFICATE OF COMPLIANCE ................................................... 34

CERTIFICATE OF SERVICE.................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Career Colls. & Sch. of Tex. v. U.S.D.O.E.,*
  98 F.4th 220 (5th Cir. 2024)...........................................................22, 26

*Chamber of Commerce of the U.S. v. DOL,*
  85 F.4th 760  (5th Cir. 2023)...............................................................13

*Ctr. for Bio. Diversity v. NMFS,*
  2024 U.S. App. LEXIS 15153 (D.C. Cir. June 21, 2024)......................12

*Data Mktg. P'ship v. DOL,*
  45 F.4th 846 (5th Cir. 2022).................................................................14

*DHS v. Regents of Univ. of Cal.,*
  591 U.S. 1 (2020) .............................................................................15, 28

*El Paso Elec. Co. v. FERC,*
  76 F. 4th 352 (5th Cir. 2023)................................................................22

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ..............................................................................16

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .........................................................15, 16, 26, 27

*Louisiana ex rel Guste v. Verity,*
  853 F.2d 322 (5th Cir. 1988) ............................................................6, 11

*Louisiana State v. NOAA,*
  70 F.4th 872 (5th Cir. 2023)..................................................................11

*Louisiana v. U.S.D.O.E.,*
  90 F.4th 461 (5th Cir. 2024)......................................................14, 22, 24

*Michigan v. EPA,*
  576 U.S. 743  (2015) ................................................................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) ..............................................13, 14, 25

*Mozilla Corp. v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) ...............................................27

*Music Choice v. Copyright Royalty Bd.,*
  970 F.3d 418 (D.C. Cir. 2020)............................................21

*Nat'l Ass'n of Mfrs. v. U.S. S.E.C.,*
  105 F.4th 802 (5th Cir. 2024)............................................16

*SEC v. Chenery Corp.,*
  318 U.S. 80  (1943) ..............................................................22

*Texas v. United States,*
  40 F. 4th 205 (5th Cir. 2022)............................................28

**Statutes**
16 U.S.C. §1531.........................................................................3
16 U.S.C. §1533.........................................................................3
16 U.S.C. §1535.......................................................................15
16 U.S.C. §1539.........................................................................3
16 U.S.C. §1540.........................................................................3
28 U.S.C. §1291.........................................................................2
28 U.S.C. §1331.........................................................................2
5 U.S.C. §706 ..........................................................................13
5 U.S.C. §§701–706...................................................................2

**Regulations**
52 Fed. Reg. 24244 (1987) .......................................................5
52 Fed. Reg. 6179 (1987) ..............................................4, 5, 16
57 Fed. Reg. 57348 (1994) .....................................................16
62 Fed. Reg. 39157 (1997) .....................................................23
68 Fed. Reg. 8456 (2003) .......................................................16

77 Fed. Reg. 27411 (2012) ............................................................. 16, 17
78 Fed. Reg. 9024 (2013) ........................................................... 7, 17, 25
81 Fed. Reg. 91097 (2016) ................................................................. 9
84 Fed. Reg. 70048 (2019) ................................................................ 10

## INTRODUCTION

Louisiana's iconic shrimp industry is in crisis. Once a thriving symbol of Louisiana's culture and coastal heritage, the inshore shrimp fleet faces collapse under the combined weight of foreign imports and federal overregulation. This is a challenge to one such regulation: a decision by the National Marine Fisheries Service to reverse more than thirty years of consistent practice and  require inshore shrimpers to use industry-destroying turtle excluder devices—commonly known as TEDs. Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70048 (Dec. 20, 2019) (ROA.9690).

Turtle populations have increased by orders of magnitude under existing rules, and NMFS has decades of findings that TEDS are unwarranted in inshore waters. But the agency was confronted with litigation by environmental activists. Rather than stand by its findings, the agency held a workshop to assign arbitrary risks of mortality for turtles released alive from shrimp nets, then published a rule mandating TEDs on the basis of those *ipse dixit* risks of mortality. That reversal of agency policy—and the underlying reversal of how the agency regulates in the face of limited data—were arbitrary and capricious.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Constitution. ROA.12. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment dismissing all of Plaintiffs claims on June 27, 2025, ROA.13316, and Plaintiffs timely noticed their appeal on July 21, 2025, ROA.13317.

## STATEMENT OF THE ISSUES

(1) Whether NMFS acted arbitrarily and capriciously by eliminating the longstanding tow-time exemption and mandating TEDs on inshore shrimpers. Raised at ROA.12970-12978.

(2) Whether NMFS failed to adequately consider shrimpers' reliance interests, rendering its decision arbitrary and capricious. Raised at ROA.12978-12981.

(3) Whether NMFS acted arbitrarily, capriciously, or contrary to law in claiming to rely on the "best available" evidence despite not seeking well-known scientific information collected by the State of Louisiana and failing to act on that information when it was provided,

contrary to its statutory duty to cooperate with States to the maximum extent practicable. Raised at ROA.12979-12980.

## STATEMENT OF THE CASE

Congress enacted the Endangered Species Act to "provide a program for the conservation of … endangered species and threatened species." 16 U.S.C. §1531(b). As relevant here, the ESA generally prohibits the "taking" of any endangered species. *See id.* §1540. But that prohibition is not absolute: the Secretary of Commerce may permit takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *Id.* §1539(a)(1)(B). Additionally, the Secretary may promulgate regulations to restrict the taking of threatened species or that are "necessary and advisable to provide for the conservation of [a threatened] species." *Id.* §1533(d).

REGULATORY HISTORY AND THE 2019 FINAL RULE

Pointing to those provisions, in 1987, the Secretary proposed requiring shrimp trawlers in the Gulf of Mexico to use so-called turtle excluder devices ("TEDs"). 52 Fed. Reg. 6179 (Mar. 2, 1987) ("1987 Proposed Rule"). Those devices consist of a grate directed to an opening through which larger turtles can escape:



ROA.1886.

The 1987 Proposed Rule called for TEDs to be used by "shrimp trawlers fishing in all ... inshore waters off southwestern Florida and from Mobile Bay westward to the Mexican border," 52 Fed. Reg. at 6181, with inshore defined as "marine or tidal waters landward of the baseline from which the territorial sea of the United States is measured," *id.* at 6180, 6183. *Id.* But it also called for a blanket exemption for shrimpers

trawling in areas where "turtles are rarely encountered" and for "vessels using small nets [that] tow for relatively short periods, thus reducing the risk that turtles might drown." *Id.* at 6181-82.

When NMFS published a final rule, it acknowledged having "no observer data," but hypothesized that "sea turtles do occur in inshore waters and NMFS believes that they are incidentally caught and drowned in shrimp trawls in inshore waters," and further hypothesized that "[i]t is very likely a significant number of sea turtles are caught and drowned in nets fished in these waters." 52 Fed. Reg. 24244, 24246, 24249. (June 29, 1987) ("1987 Final Rule"). Nevertheless, many recognized that TEDs were unsuitable for inshore use, clogging with vegetation and debris and providing no meaningful conservation benefit where tow times were already short. So NMFS authorized inshore shrimpers to rely on so-called "tow time restrictions" in lieu of TEDs, *i.e.*, restrictions on how long the shrimper could tow the net without checking it for captures turtles. *Id.* at 24251-24252 Indeed, NMFS specifically found "that tow time restrictions can be an effective technique to reduce sea turtle mortality associated with shrimp trawling" despite being "difficult to enforce." *Id.* 24246, 24249.

The State of Louisiana promptly challenged the 1987 Final Rule in *Louisiana ex rel Guste v. Verity*, 853 F.2d 322 (5th Cir. 1988). Louisiana attacked "the sufficiency of the administrative record to support the TED and trawling period regulations." *Id.* at 327. The State pointed to twenty years of trawl sampling by the Louisiana Department of Wildlife and Fisheries, which reported that not one sea turtle was captured in 36,837 trawl samples in Louisiana waters. *Id.* at 328. A panel of this Court believed Louisiana challenge was not without merit, but concluded it was constrained by the deferential standard of review. *Id.* at 329. The rule was accordingly upheld, but the panel emphasized that the record distinguished between offshore areas and "inshore areas, where TED use by either large or small vessels may be impaired by often heavier concentrations of underwater debris." *Id.* at 326.

Over the following twenty years, sea turtle populations rapidly increased; turtle populations began to vary with natural factors; natural disease became a leading concern; and NMFS reaffirmed the use of tow time limitations in inshore waters. ROA.1938-1939. Activists nevertheless sued, demanding that NMFS "suspend authorization of shrimp trawl fishing … for any vessel … that is not operating with a

properly installed" TED and "closure of all or part of the U.S. shrimp trawl fisheries." *Turtle Island Restoration Network v. NMFS*, No. 1:11-cv-01813 (D.D.C. Oct. 13, 2011). ROA.13087-13088. NMFS settled that litigation by "agree[ing] to publish a proposed rule … to address sea turtle interactions with skimmer trawls harvesting shrimp in state waters …." ROA.13087-13088.

NMFS dutifully proposed expanding TED requirements, purportedly due to elevated strandings, evidence of turtles dying from forced submergence, and difficulty in enforcing tow time limits, 77 Fed. Reg. 27411, 27412 (May 10, 2012), but it ultimately withdrew that proposal as unwarranted, 78 Fed. Reg. 9024 (Feb. 7, 2013). The State of Mississippi had notably submitted data showing that the timing of turtle strandings did not align with shrimping effort. ROA.8833-8835. And NMFS explained that when it actually collected data by shifting observers to inshore skimmer trawls, they reported the capture of 24 sea turtles, but all were released alive, and its prior mortality estimates "likely do not reflect actual fishery impacts on sea turtles." *Id.* at 9025.[1]

---

[1] The agency's description underplays what actually happened. As it turned out, many of the endangered Kemp's ridley turtles that interacted with shrimp nets were small enough to pass through a TED into the cod end of the net. Had the activists and NMFS had their way and eliminated tow time restrictions, turtles that

7

Defendants then issued a Biological Opinion that allowing shrimp fisheries to continue under the existing regulations was not likely to jeopardize the continued existence of any listed species. ROA.11365.

Activists sued again. *Oceana, Inc. v. Ross*, No. 1:15-cv-00555 (D.D.C. Apr. 14, 2015). The new litigation was stayed after NMFS announced it would "propose a rule withdrawing the alternative tow time restriction . . . and requiring all skimmer trawls, pusher-head trawls, and wing nets … operating in near-shore waters to use [TEDS] being tested by the agency." ROA.13088-13089.

Fishermen noted the obvious: "TEDs were not needed as sea turtle populations are increasing and any sea turtles captured by skimmer trawlers were released alive." ROA.1536. So NMFS decided to bolster its case by conducting a nonpublic "workshop" for NMFS employees—in West Virginia—then publish a "report" of about turtles released alive that may nevertheless die. ROA.11200, 11250-11252. NMFS then justified its proposed rule by again pointing to tow times being

---

would have otherwise been safely released by vessels operating under tow time limits would likely have drowned in nets equipped with TEDs. There's a lesson there about making industry-destroying decisions in the absence of good data. "It ain't what you don't know that gets you into trouble. It's what you know for sure that just ain't so." – Mark Twain.

"inherently difficult to enforce," "the increased abundance of sea turtles in the northern Gulf of Mexico," and adding a vague reference to turtle mortality. 81 Fed. Reg. 91097, 91098 (Dec. 16, 2016), ROA.2394.[2]

Commenters—including the Louisiana Shrimp Association—again emphasized that NMFS's "own data clearly shows that turtle populations have thrived" under regulations "which allow skimmer shrimping vessels to operate without TEDs," and attacked the "arbitrary mortality scale for turtles released alive" that underlay the proposed rule. ROA.8842-8851. Likewise the Louisiana Department of Wildlife and Fisheries, which also noted that NMFS's extrapolation of incidental captures in one net type to different net types was "inappropriate." ROA.3394-3396. And the Mississippi Department of Marine Resources similarly said the proposed rule was of "questionable necessity," pointing to data it had shared with NMFS establishing that turtle strandings did not match the timing of shrimp effort. ROA.8833-8835. Indeed, Mississippi noted it had asked NMFS conduct "a comprehensive sea turtle population and distribution

---

[2] NMFS's internal documents omitted the reference to mortality: They tied the proposed rule to "an increasing number of … sea turtles interacting with the Southeastern U.S. shrimp fisheries," which the agency "attributed to numerous ongoing conservation efforts, such as the protection of sea turtle nesting beaches and the required use of turtle excluder devices (TEDs) in otter trawls…." ROA.2377; *see also* ROA.2335.

study" before any new rules were adopted. ROA.8833. That request apparently went unheeded.

Three years later, NMFS published a Final Rule requiring all skimmer trawl vessels 40 feet and greater in length to use TEDs, regardless of whether the vessel was shrimping inshore or offshore. ROA.9690; 84 Fed. Reg. 70048 (Dec. 20, 2019). In response to the comments that then-existing tow time limitations were sufficient—as evidenced by the growing number of Kemp's ridley nests—NMFS claimed the "best available information and expert opinion … indicate that persistent or delayed effects can lead to mortality … including deaths of some turtles that appear to be in good health at the time of release." ROA.9692. In support, the agency pointed to the report of its workshop in 2015, together with a NMFS Procedural Directive. ROA.9692. The agency then blithely rejected limiting the rule by geographic area because it did "not have sufficient information to confidently identify areas where sea turtle interactions would not occur." ROA.9692.

NMFS did, however, "acknowledge the regulation may have significant adverse economic effects on the shrimp industry." ROA.9692. It conceded the 2019 Final Rule would result in reduced shrimp harvest

10

per tow, and that many "vessels are already operating on small positive or negative economic margins." ROA.9701. The agency then estimated that "32 percent of the affected part-time vessels could cease operations due to this rule," *i.e.*, 178 vessels could cease operating. ROA.9694, 9703.

THE LOUISIANA AND CENTER FOR BIOLOGICAL DIVERSITY LITIGATIONS

In May 2021, the Louisiana Department of Wildlife and Fisheries petitioned NMFS to "reverse the previous rule mandating TEDs in skimmer vessels 40 feet in length or greater" or, alternatively, "designate the state waters of Louisiana as an exclusion zone from the current and any proposed TED rules, based upon Louisiana's recent bycatch studies showing virtually no turtle interaction." ROA.12993. Louisiana supplied supporting data from the state's annual bycatch characterization study, *i.e.*, the same study at issue in *Guste*. ROA.12991, 12985-12988.

The State of Louisiana then challenged the 2019 Final Rule. The district court dismissed Louisiana's claims for lack of standing, and this Court affirmed. *Louisiana State v. NOAA*, 70 F.4th 872 (5th Cir. 2023). The D.C. Circuit then rejected activists claims that the 2019 Final Rule didn't go far enough. *Ctr. for Bio. Diversity v. NMFS*, 2024 U.S. App. LEXIS 15153 (D.C. Cir. June 21, 2024).

11

PROCEEDINGS BELOW

After the State of Louisiana's case was dismissed, the Louisiana Shrimp Association—led by a commercial shrimper and later joined by individual plaintiffs—filed this challenge. ROA.9, 71, 13259. Plaintiffs moved for summary judgment, arguing that NMFS reversed decades of policy without identifying any new data, ignored contrary state findings, and failed to assess the socioeconomic devastation the rule would cause. ROA.12952. Defendants responded with a Cross-Motion for Summary Judgment, defending the rule primarily on deference grounds. ROA.13003. Plaintiffs thereafter filed an opposition, ROA.13235, and Defendants filed a Reply, ROA.13268.

On June 27, 2025, the district court issued its Order and Reasons granting Defendants' motion and denying Plaintiffs' motion. ROA.13285. The court held that NMFS provided a "reasonable explanation" for its policy reversal and deferred to the agency's technical expertise. The same day, the court entered final judgment, dismissing all claims with prejudice. Plaintiffs filed a timely Notice of Appeal on July 21, 2025. ROA.13317.

**STANDARD OF REVIEW**

This Court reviews a district court's grant of summary judgment in an Administrative Procedure Act case *de novo*. *Rest. L. Ctr. v. U.S.D.O.L.*, 120 F.4th 163, 170 (5th Cir. 2024). Under the APA, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory … authority or limitations"; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706.

That "requires this court to scrutinize the record to determine whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Chamber of Commerce of the U.S. v. DOL*, 85 F.4th 760, 768 (5th Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Although "due deference" must be given to agencies; arbitrary and capricious review is not "'toothless'; rather it has 'serious bite.'" *Louisiana v. U.S.D.O.E.*, 90 F.4th 461, 470 (5th Cir. 2024) (quoting *Data Mktg. P'ship v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022)).

13

## SUMMARY OF THE ARGUMENT

The district court erred in upholding NMFS's 2019 Final Rule. The rule's mandate that Louisiana inshore shrimpers install TEDs was arbitrary and capricious.

First, the court accepted NMFS's reversal of a thirty-year policy without requiring substantial evidence or a reasoned explanation. For decades, NMFS determined that tow-time limits effectively protected sea turtles in inshore waters and that TEDs were unnecessary and impractical for small skimmer trawls. In 2019, the agency abandoned that position without new data showing turtle mortality in Louisiana waters or explaining why its prior findings were wrong. By crediting agency *ipse dixit* and a single publication about one or two turtle deaths in North Carolina gillnets non-regional data as a basis for rulemaking, the agency failed to undertake rational decision making, including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Underlying that decision was the agency's impermissible *sub silentio* reversal of its presumption that TEDs aren't necessary and appropriate where ecological data is lacking.

14

Second, the district court overlooked that NMFS disregarded serious reliance interests. Louisiana shrimpers built their livelihoods around long-standing tow-time regulations that NMFS repeatedly affirmed. By failing to consider those reliance interests, NMFS acted arbitrarily under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), and *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020). The district court erred by failing to require NMFS to consider and make a determination about reliance interests.

Third, the district court excused NMFS's failure to obtain the State of Louisiana's scientific information, as well as NMFS's failure to consider Louisiana's formal request for a geographic exemption. Louisiana provided data showing that turtle strandings in inshore waters are rare. NMFS's dismissal of that evidence without reasoned response is contrary to its statutory obligation to "cooperate to the maximum extent practicable with the States." 16 U.S.C. §1535(a). On these facts, it also suggests NMFS's thin justifications were less-than-genuine. *DOC v. New York*, 588 U.S. 752, 785 (2019).

This Court should reverse the district court's judgment and set aside the 2019 Final Rule.

## ARGUMENT

### I. NMFS's Reversal of Its Longstanding Tow-Time Policy Was Arbitrary and Capricious.

For more than thirty years, the National Marine Fisheries Service (NMFS) concluded that short tow times provided an effective and practical means of protecting sea turtles in inshore shrimp fisheries. Under those rules, shrimpers in inshore waters could operate skimmer trawls without TEDs so long as their tows remained short enough to prevent turtle drownings. ROA.12971 (citing AR 219-222; 52 Fed. Reg. 6179 (1987), 57 Fed. Reg. 57348 (1994), 68 Fed. Reg. 8456 (2003), 77 Fed. Reg. 27411 (2012))). The district court correctly found that the 2019 Final Rule reflected a change in that position. ROA.13294. Unacknowledged is that the 2019 Final Rule also reflected a change in NMFS's position vis-à-vis the regulatory presumption for weak or no data.

Agencies are, of course, "free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)). At a minimum, "[t]he agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* The agency

16

"need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* "But when 'its new policy rests upon factual findings that contradict those which underlay its prior policy,' a more detailed explanation is required." *Nat'l Ass'n of Mfrs. v. U.S. S.E.C.*, 105 F.4th 802, 811 (5th Cir. 2024) (quoting *Fox*, 556 U.S. at 515-516). Applying those rules here, the 2019 Final Rule must be vacated and set aside.

## A. The basic facts of turtle interactions have not changed.

To understand what might be the "good reasons" or "more detailed explanation" for the 2019 Final Rule, start with what facts haven't changed. Beginning in 1987, NMFS hypothesized that "sea turtles do occur in inshore waters and NMFS," "that they are incidentally caught and drowned in shrimp trawls in inshore waters," further hypothesized that "[i]t is very likely a significant number of sea turtles are caught and drowned in nets fished in these waters," and noted the difficulty with enforcing tow time restrictions. 52 Fed. Reg. at 24246, 24249. Indeed, that "tow time restrictions are difficult to enforce" and "vessels in the skimmer trawl fleet exceed alternative tow time requirements" were known problems in 2012. 77 Fed. Reg. at 27412, 27413. And as of 2013,

17

NMFS believed up to 1676 sea turtle mortalities could be avoided by requiring skimmer trawls to use TEDs. 78 Fed. Reg. 9025.

Despite those facts, NMFS concluded that requiring the use of TEDs by inshore skimmers was not warranted. 78 Fed. Reg. at 9025. In making that determination, NMFS noted "the potentially significant economic ramifications a TED requirement would have to fisherman participating in the skimmer trawl industry combined with highly uncertain ecological benefits." *Id.*

## B. The agency failed to identify any data — and certainly no *new* data — that justifies its change in position.

NMFS thus primarily justified the 2019 Final Rule by stating that the "best available information and expert opinion … indicate that persistent or delayed effects can lead to mortality (post-interaction mortality), including deaths of some turtles that appear to be in good health at the time of release. ROA.9692. NMFS pointed to the Final Environmental Impact Statement, Stacey et al 2015 [sic], and NMFS Procedural Directive 02-110-21 for support. ROA.9692. But a review of the record reveals that NMFS hadn't developed any new information since 2013. Rather, there is only the *ipse dixit* of unidentified agency experts.

18

**1.** Start with the FEIS and its calculations of post-interaction sea turtle mortality, *i.e.*, how many captured turtles the agency believes died after they were released alive. ROA.2020-2023. The FEIS explains that those mortality values were generated using post interaction mortality "criteria" of 10% for low risk, 50% for intermediate risk, 80% for high risk, and 100% for turtles determined to be dead. For the source of those numbers, the FEIS states that they were developed at the workshop reported in Stacy et al 2016.

**2.** The Procedural Directive cited in the Final Rule elaborates on how the mortality criteria "were developed using the outcomes of two [NMFS] multidisciplinary workshops," which the Procedural Directive identifies as "Upite 2011" and "Stacy et al. 2016." RJN  Exh. A at 3. To whit:

> Following review and consideration of the individual experts' comments and the available data, a mortality percentage of 10% is assigned to [low risk] sea turtles exhibiting Category 1 observations and that are caught by fisheries for which current data do not indicate a high risk of [decompression sickness, *i.e.*, turtles caught in less than 40m of water]. This percentage is the central value between no resulting mortality (0% mortality), which is not supported by available scientific information, and the approximate percent mortality reported in turtles caught in shallow-set gillnets [in North Carolina] that exhibited Category 1 observations (1-2 out of 7; 14.3-28.6% mortality) (Snoddy and Williard 2010).

19

\* \* \* \* \*

> The intermediate mortality risk (Category 2) and high mortality risk (Category 3) categories include observations where direct measurements of mortality are lacking; thus, mortality rates are based almost entirely on clinical experience and expert opinion. Mortality rates of 50% and 80% were assigned to intermediate and high risk categories, respectively, following the initial 2009 GARFO workshop and were further supported in expert opinions solicited in the subsequent 2015 workshop.

RJN Exh. A at 5-6.

3.  The Stacy, et al 2016 report itself fares no better. The report includes summaries of the threats to sea turtles, sorting those threats "by Gear Type." ROA.11216. The section dedicated to the gear type at issue here, "Interactions with Trawls," relied on six studies, all of which predate 2007. ROA.11216. The group cites "Lutz & Dunbar-Cooper 1986, Henwood & Stuntz 1987, Stabenau et al. 1991, Harms et al. 2003, Stabenau & Vietti 2003, Sasso & Epperly 2006." Obviously, each of those studies predates Defendants' 2012 policy affirming tow-time exemptions. Similarly, the newest the newest data in a background section on the physiological effects of capturing turtles was published in 2003, so it predates Defendants' 2012 policy affirmance, too. ROA.11215. Indeed, the vast majority of the Stacy, et al., report merely recounts the polling of federal employees on various issues, often with substantial divergence

of opinion. And it was that polling that apparently generated the numerical "mortality criteria" underlying the Final Rule. There is nothing new about the data in Stacy et al.

**4.** At bottom, the record makes clear the 2019 Final Rule relies on nothing more than the death of one (or maybe two; NMFS isn't sure) of seven turtles captured in a gillnet off North Carolina as reported in Snoddy and Williard 2010—supplemented by agency *ipse dixit*—for its speculation that turtle mortality "could be" higher than previously estimated. But NMFS elsewhere stated that it needed at least 10 individual turtles observed to even make estimates of mortality. ROA.10184. More broadly, NMFS generally performs separate analyses for the North Carolina shrimp fishery and the Gulf shrimp fishery. *E.g.*, ROA.11539-11540. That's in addition to the impact of specific gear on turtle mortality and the distinction the agency draws between gear types in the 2019 Final Rule — key points given that fixed gillnets aren't used for shrimping at all. ROA.9691, 9697, 10176, 11216, 11507.

Not surprisingly, NMFS's Procedural Directive carefully states the North Carolina gillnet data merely "support[s] concerns that some sea turtles later die despite appearing to be relatively unaffected upon capture," RJN

21

Exh. A. at 4, not that the North Carolina data is applicable to skim nets used in the Gulf shrimp fisheries. To the extent 2019 Final Rule relies on the deaths of one or two turtles in North Carolina gillnets for support, the unexplained inconsistency in using that data in view of NMFS's statements about the minimum number of turtles necessary to estimate mortality and its careful parsing of data between types of nets, renders the 2019 Final Rule arbitrary and capricious. *See Chamber of Commerce*, 885 F.3d at 382 (noting that "internal inconsistency [is] characteristic of arbitrary and unreasonable agency action").[3]

**5.** What's left is agency *ipse dixit* for the mortality percentages underlying NMFS's speculation that turtle mortality "could be" higher than the agency previously estimated. ROA.9692. Such *ipse dixit* doesn't even rise to the level of rational decision-making or substantial evidence. *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020). Put differently, "'falling back on unexplained claims of agency expertise does not carry [NMFS's] burden' under the

---

[3] NMFS's data and calculations supporting the 2019 Final Rule are not the type one expects to find in a scientific analysis. Over the year, the agency has repeatedly noted "lack of data" and "limited data" on turtle interaction issues, *e.g.*, ROA.9697, but its analysis makes no attempt to account for statistical uncertainty. There are no confidence intervals, for example. Contrast the agency's analysis of sea turtle mortality in otter trawls, which include the 95% confidence intervals expected of a scientific publication, albeit often spanning a full order of magnitude. ROA.10166, 10191.

APA." *Career Colls. & Sch. of Tex. v. U.S.D.O.E.*, 98 F.4th 220, 251 (5th Cir. 2024) (quoting *El Paso Elec. Co. v. FERC*, 76 F. 4th 352, 364 (5th Cir. 2023)).

**6.** That the "references and background" section of Stacy et al may have cited to more recent publications unrelated to post-interaction turtle mortality in shrimp fisheries doesn't establish that NMFS had relevant, new data. It was NMFS's burden to connect its action to underlying data. And the 2019 Final Rule, the FEIS, and the Procedural Directive make clear that they were relying on post interaction mortality criteria that were based on the one or two deaths reported in Snoddy and Williard 2010 or pure *ipse dixit*.

The law is clear that the grounds upon which the 2019 Final Rule "must be judged are those upon which the record discloses its action was based." *Louisiana*, 90 F.4th at 469 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). That NMFS laundered its reliance on "Snoddy and Williard 2010" and/or *ipse dixit* through a self-published "report," then added in a handful of unused citations with no clear relation to the numeric mortality criteria, then laundered the same this support through a Policy Directive can't carry NMFS's burden. The district court's contrary conclusion at the urging of *amici* activists, ROA.13299, was error.

### C. NMFS elided or failed to consider facts that undermined the need for the 2019 Final Rule.

What NMFS did not consider is also a problem. The agency's limited authority to issue "necessary and appropriate" protective regulations

requires consideration of costs and benefits. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("No regulation is 'appropriate' if it does significantly more harm than good."). NMFS accordingly has a long-standing practice of doing so when regulating incidental takings. *E.g.*, Taking of Marine Mammals Incidental to Commercial Fishing Operations, 62 Fed. Reg. 39157, 39159 (July 22, 1997) (NMFS "has identified two approaches for reducing the risk of serious injury or mortality to right whales …. One approach … would guarantee reduction of entanglements causing serious injury and mortalities but only at a high cost to many fishermen. The second approach … does not carry the guarantee of the first approach but it is calculated to have a reasonable chance for success … while minimizing costs to the fishery." NMFS "adopts the second approach"). But the cost-benefit analysis was arbitrary and capricious.

**1.** There is no dispute that the 2019 Final Rule imposes very real costs of *at least* those cited by NMFS, including economic costs and shrimp vessels that will cease operating.

**2.** Focusing on the benefits side of the ledger, the agency acknowledged comments that turtle populations were growing under the status-quo of inshore tow-time limits, but responded only by citing its

speculative calculations indicating that "tow times may not be as effective in reducing sea turtle bycatch and mortality as previously thought." ROA.9692. That's a classic bare acknowledgement of facts that undermine the rule, followed by a non sequitur citation to other facts to support the rule. *See Louisiana*, 90 F.4th at 473. Assuming *arguendo* that the 2019 Final Rule will reduce some mortality, the question is whether that reduction outweighs the cost in view of the growing population. What NMFS did was an "unexplained balancing of evidence" that rendered the 2019 Final Rule arbitrary and capricious. *Id.*

**2.** Worse, NMFS—at most—only obliquely acknowledged the impact of its own data showing that bycatch per unit effort ("CPUE") was decreasing for Kemp's ridley and loggerhead turtles. ROA.9691, 10183-10184. NMFS's experts noted that CPUE decreased both in nets with TEDs and nets without TEDs, which "seems to imply that the cause [of the decrease] was not [TEDs]." ROA.10184. The agency's experts also noted that the decrease "is not likely to be caused by a decrease in abundance, since Kemp's ridley abundance is thought to be increasing in the [Gulf of America] over time…" ROA.10184. Surely decreasing bycatch untied to TED use—despite increasing turtle population—is an

25

important aspect of the problem. The agency's failure to consider it is yet another reason the 2019 Final Rule is arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

### D. NMFS impermissibly changed its regulatory presumption sub silentio.

At bottom, the agency's data on turtle locations, interactions, and mortality is thin. But that's always been the case. When NMFS published the 1987 Final Rule, it acknowledged having "no observer data," but hypothesized that turtles were being caught and drowned by inshore skimmers. In the absence of solid data, the agency defaulted to the light touch of tow time restrictions. NMFS did so again in 2013, expressly pointing to the uncertainty of its ecological data when weighed against "the potentially significant economic ramifications." 78 Fed. Reg. at 9025.

The lack of data hasn't changed. Enforcement of tow-time limits remains difficult, and the extent of violations "is unclear." ROA.2394. As NMFS's reliance on expert *ipse dixit* suggests, "the data on post-interaction mortality is limited to a small number of studies." ROA.11229. And NMFS still "do[es] not have sufficient information to confidently identify areas where sea turtle interactions would not occur." ROA.9692.

26

What has changed is NMFS's presumption when ecological data is lacking. This Court has stringently policed the use of regulatory presumptions. *See Career Colls.*, 98 F.4th at 250-251. But NMFS doesn't even appear to have recognized that it was changing its underlying presumption on how to regulate where data is lacking. "An agency may not … depart from a prior policy *sub silentio*." *Fox*, 556 U.S. at 515. That lack of awareness renders the 2019 Final Rule arbitrary and capricious.

## II. NMFS failed to account for the shrimping industry's thirty years of reliance interests.

Since 1987, NMFS has permitted shrimpers in inshore waters to rely on tow-time restrictions rather TEDs, recognizing that TEDs were ill-suited for shallow, debris-laden environments. For over three decades, Louisiana shrimpers structured their operations, equipment, and investment decisions around that rule. They purchased smaller skimmer trawls designed for short tows, maintained narrow profit margins under predictable operating costs, and made multi-generational business decisions based on a stable regulatory regime. ROA.12986–12993. And surrounding service-providers did, too. ROA.8879.

This stability fostered not only individual reliance but also an entire regional economy. As Acy Cooper, President of the Louisiana

Shrimp Association, explained, shrimpers "reasonably relied on this regulatory framework when making investment and operational decisions" and "many will be forced to cease operations due to the cost and burden of complying with the TED requirement." ROA.13259 – 13261. These reliance interests, formed over decades of consistent agency policy, trigger the heightened justification requirement articulated in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

The district court tried to side-step that problem by pointing to *Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019). ROA.13304. But in *Mozilla*, the agency "acknowledged … the significance of reliance interests as a potential weight against its [new] decision," then found "there were no serious reliance interests attributable to" its earlier decision. 940 F.3d at 64. The *Mozilla* agency alternatively found "reliance would [not] have been reasonable in any event" given that it was simply restoring an even earlier policy after a short, litigation-heavy interim. *Id*. Perhaps NMFS would have made a similar finding here, notwithstanding its 40 years of permitting alternatives to TEDs. But, like in *Mozilla*, "that consideration must be undertaken by the agency in the first instance,

subject to normal APA review." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 31, 32 (2020).

The district court thus pointed to NMFS's consideration of costs. ROA.13305. But although costs and reliance interests overlap, they are distinct. Both must be accounted for. *See Texas v. United States*, 40 F. 4th 205, 228 (5th Cir. 2022) ("DHS has not shown a likelihood that it adequately considered the relevant costs to the States or their reliance interests"). The 2019 Final Rule was arbitrary and capricious because there was no such accounting for reliance interests. 591 U.S. at 31, 32.

### III. NMFS's failed to seek and use Louisiana's scientific data before or after the 2019 Final Rule.

After the 2019 Final Rule was published, Louisiana supplied NMFS with data from the State's long-running bycatch study, which Louisiana started in partnership with NMFS. ROA.12985-12993. That study included 128,781 trawls over 55 years, and covered offshore, inshore, and interior marsh trawls. ROA.12986-12987. During those 55 years, the study recorded only two turtle interactions, both of which were released alive. Focusing in on more recent data from 2019 and 2020, the study included 363 trawls totaling 501 hours without a single turtle

interaction, of which 291 trawls totaling 335 hours were from skimmer vessels. ROA.12991.

The district court dismissed that information as outside the administrative record, and further noted that Louisiana's data "directly contradicts" data that NMFS collected. ROA.13307-13308. Appellants agree. Of course, the 2019 Final Rule pervasively claims to have relied on the "best available" data. That NMFS didn't obtain data from a State's well-known and long-running bycatch study—that NMFS helped set up—seriously undercuts its claim to have used the "best available" data in the TEDs rulemaking.

Moreover, NMFS rejected limiting the TEDs requirement by geographic area because it claimed "not [to] have sufficient information to confidently identify areas where sea turtle interactions would not occur." ROA.9692. Louisiana's bycatch study provides precisely the type of information NMFS claimed to be lacking. Louisiana accordingly asked NMFS to "designate the state waters of Louisiana as an exclusion zone from the current and any proposed TED rules, based upon Louisiana's recent bycatch studies showing virtually no turtle interaction…." ROA.12993. Four years have now passed. NMFS apparently has not

acted on Louisiana's request, notwithstanding the agency's statutory obligation to "cooperate to the maximum extent practicable with the States." 15 U.S.C. §1535(a).

In considering whether NMFS's thin justifications for its policy reversals are genuine, the Court may consider those facts. *DOC v. New York*, 588 U.S. 752, 785 (2019). The Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.*

## CONCLUSION

For generations, Louisiana's shrimpers have worked the same inshore waters that sustained their parents and grandparents, providing for their families and preserving a way of life central to the culture and economy of coastal Louisiana. They followed every rule that federal regulators imposed, adjusting their methods, their equipment, and their livelihoods to comply with a tow-time system that the government itself long deemed effective. They did so not as adversaries, but as stewards of the same marine resources the Endangered Species Act was meant to protect.

Yet the same agency that once recognized their diligence and cooperation turned against them in 2019—abandoning decades of science, ignoring the State's expertise, and imposing a mandate that threatens to end the inshore shrimp fishery altogether. The record shows no new data, no genuine consultation, and no reasoned

explanation. What it shows instead is an unexamined policy reversal that devastates a local industry while offering no measurable benefit to the species it purports to protect. The APA does not permit such arbitrary decision-making.

This case is not simply about a piece of equipment. It is about whether an agency may upend a generation of settled expectations, all while blinding itself to evidence collected by the sovereign State most affected. The district court's decision, if allowed to stand, would erode the basic safeguards that ensure reasoned governance and federal restraint.

For these reasons, the Court should **REVERSE** the district court's judgment, **VACATE**, and **SET ASIDE** the 2019 Final Rule.

Respectfully submitted,

/s/ Sarah Harbison
SARAH HARBISON
PELICAN INSTITUTE
 FOR PUBLIC POLICY
400 Poydras Street, Suite 900
New Orleans, LA 70130
Tel. (504) 952-8016
sarah@pelicaninstitute.org

*Counsel for Plaintiffs-Appellants*

/s/ Joseph S. St. John
JOSEPH S. ST. JOHN
 *Counsel of Record
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
Tel. (410) 212-3475
scott@stjohnlaw.com

*Counsel for Plaintiff-Appellant
Louisiana Shrimp Association*

33

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6,210 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*s/ Joseph S. St. John*

Dated: November 21, 2025      Joseph S. St. John

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Plaintiff-Appellant's Opening Brief using the court's CM/ECF system which will automatically generate and send by email a Notice of Docket Activity to registered attorneys currently participating in this case, constituting service on those attorneys.

|  |  |
|---|---|
|  | *s/ Joseph S. St. John* |
| Dated: November 21, 2025 | Joseph S. St. John |